UNITED STATES DISTRICT COURT

DISTRICT OF SOUTH DAKOTA

WESTERN DIVISION

| | | |
|---|---|---|
| STEVEN J. WADDELL, | ) | CIV. 10-5043-JLV |
| | ) | |
| Plaintiff, | ) | ORDER REVERSING |
| | ) | DECISION OF THE |
| vs. | ) | COMMISSIONER AND |
| | ) | REMANDING FOR |
| MICHAEL J. ASTRUE, | ) | CALCULATION AND |
| Commissioner of Social Security, | ) | AWARD OF BENEFITS |
| | ) | |
| Defendant. | ) | |

**INTRODUCTION**

On January 25, 2006, plaintiff Steven J. Waddell protectively filed an application for supplemental security income ("SSI") pursuant to Title XVI of the Social Security Act, 42 U.S.C. §§ 1381-83f (2006). (Administrative Record, pp. 88-91[1] and joint statement of material facts ("JSMF") (Docket 8, p. 1)). After denial of his application, an Administrative Law Judge ("ALJ") held an evidentiary hearing on February 21, 2008. Id. On February 26, 2008, the ALJ concluded Mr. Waddell was not disabled and denied benefits. Id. The Appeals Council denied plaintiff's request for review. Id. at p. 3. The decision of the ALJ became the final decision of the Commissioner. Id. Plaintiff timely filed his complaint in district court. (Dockets 1, ¶ 8 and 5 ¶ I)).

---

[1]The court will cite to information in the administrative record by referencing "AR, p. ____."

The court issued a briefing schedule requiring the parties to file a JSMF. (Docket 7).  If there were any disputed facts, the parties were required to attach a separate joint statement of disputed facts.  Id.  The parties filed their JSMF. (Docket 8).  Plaintiff then filed a motion for an order reversing the decision of the Commissioner.  (Docket 9).  Following briefing, the motion is ripe for resolution.

For the reasons stated below, the motion is granted and the decision of the Commissioner is reversed.

## FACTUAL AND PROCEDURAL HISTORY

The parties' JSMF (Docket 8) is incorporated by reference.  Further recitation of salient facts is included in the discussion section of this order.

## STANDARD OF REVIEW

The Commissioner's findings must be upheld if they are supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006).  The court reviews the Commissioner's decision to determine if an error of law was committed.  Smith v. Sullivan, 982 F.2d 308, 311 (8th Cir. 1992).

"Substantial evidence is less than a preponderance, but is enough that a reasonable mind would find it adequate to support the Commissioner's conclusion."  Cox v. Barnhart, 471 F.3d 902, 906 (8th Cir. 2006) (internal citation and quotation marks omitted).  Substantial evidence is evidence that a

2

reasonable mind might accept as adequate to support the Commissioner's decision. Choate, 457 F.3d at 869 (quoting Ellis v.Barnhart, 392 F.3d 988, 993 (8th Cir. 2005)). The review of a decision to deny disability benefits is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision." Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).

It is not the role of the court to re-weigh the evidence and, even if this court would have decided the case differently, it cannot reverse the Commissioner's decision if that decision is supported by good reason and is based on substantial evidence. Guilliams v. Barnhart, 393 F.3d 798, 801 (8th Cir. 2005). A reviewing court may not reverse the Commissioner's decision " 'merely because substantial evidence would have supported an opposite decision.' " Reed, 399 F.3d at 920 (quoting Shannon v. Chater, 54 F.3d 484, 486 (8th Cir. 1995)).

## DISCUSSION

"Disability" is defined as the inability "to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment [or combination of impairments] which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than twelve months." 42 U.S.C. § 1382c(a)(3)(A). Although SSI is not payable prior to the month following the month in which the application was

filed, the ALJ is required to consider a claimant's complete medical history. 20 CFR §§ 416.335 and 416.912(d).

The Social Security Administration established a five-step sequential evaluation process for determining whether an individual is disabled.[2] 20 CFR §§ 404.1520(a)(4) and 416.920(a)(4).[3]  If the ALJ determines a claimant is not disabled at any step of the process, the evaluation does not proceed to the next step as the claimant is not disabled.  Id.  The five-step sequential evaluation process is:

> (1) whether the claimant is presently engaged in a "substantial gainful activity"; (2) whether the claimant has a severe impairment– one that significantly limits the claimant's physical or mental ability to perform basic work activities; (3) whether the claimant has an impairment that meets or equals a presumptively disabling impairment listed in the regulations (if so, the claimant is disabled without regard to age, education, and work experience); (4) whether the claimant has the residual functional capacity to perform . . . past relevant work; and (5) if the claimant cannot perform the past work, the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform.

Baker v. Apfel, 159 F.3d 1140, 1143-44 (8th Cir. 1998).  The ALJ applied the five-step sequential evaluation required by the Social Security Administration regulations.  (Docket 8 at pp. 1-2).

---

[2]The same five-step analysis determines eligibility for disability insurance benefits ("DIB") as well as for SSI benefits.  House v. Astrue, 500 F.3d 741, 742 n.1 (8th Cir. 2007).

[3]All references will be to part 416, which addresses SSI claims under Title XVI of the Act.

THE FIRST STEP

At step one, the ALJ must determine if the claimant is engaging in substantial gainful activity ("SGA").  20 CFR § 416.920(b).  SGA is defined as "work activity that is both substantial and gainful."  20 CFR § 416.972.  "Substantial work activity is work activity that involves doing significant physical or mental activities."  20 CFR § 416.972(a).  "Gainful work activity is work activity that . . . is . . . usually done for pay or profit, whether or not a profit is realized."  20 CFR § 416.972(b).  If a claimant is not engaging in SGA, the analysis proceeds to step two.

The ALJ determined Mr. Waddell had not been engaged in substantial gainful activity since January 25, 2006, the date he applied for SSI benefits.  (Docket 8 at p. 3).  Thus, the evaluation proceeds to step two.

THE SECOND STEP

At step two, the ALJ must decide whether the claimant has a medically determinable impairment that is severe or a combination of impairments that are severe.  20 CPR § 416.920(c).  A medically determinable impairment can only be established by an acceptable medical source.  20 CFR § 416.913(a).  Accepted medical sources include, among others, licensed psychologists.  20 CFR § 416.913(a)(2).  An impairment or combination of impairments is severe if it significantly limits an individual's ability to perform basic work activities.  20 CFR § 416.921.  Basic work activities focus on "the abilities and

5

aptitudes necessary to do most jobs." Id. at subsection (b).  Examples of those abilities and aptitudes are:

(1)    Physical functions such as walking, standing, sitting, lifting, pushing, pulling, reaching, carrying, or handling;

(2)    Capacities for seeing, hearing, and speaking;

(3)    Understanding, carrying out, and remembering simple instructions;

(4)    Use of judgment;

(5)    Responding appropriately to supervision, co-workers and usual work situations; and

(6)    Dealing with changes in a routine work setting.

Id.  If a claimant has a severe impairment or combination of impairments which are severe, the analysis continues to step three.

At step two, the ALJ found Mr. Waddell had right knee arthritis, obesity, depression, and a personality disorder, all "severe" impairments under the regulations.  (Docket 8 at p. 3).  The evaluation then proceeds to step three.

THE THIRD STEP

At step three, the ALJ determines whether claimant's impairment or combination of impairments meets or medically equals the criteria of an impairment listed in 20 CFR Part 404, Subpart P, Appendix 1.  20 CFR §§ 416.920(d), 416.925 and 416.926.  If a claimant's impairment or combination of impairments meets or medically equals the criteria for one of the impairments listed and meets the duration requirement of 20 CFR

6

§ 416.909, claimant is considered disabled.  If not covered by these criteria, the analysis is not over and the ALJ proceeds to the next step.

The ALJ determined Mr. Waddell did not have an impairment or combination of impairments which met or were medically equal to one of the impairments listed in 20 CFR Part 404, Subpart P, Appendix 1.  (Docket 8 at p. 3).  Mr. Waddell does not challenge that conclusion.  (Docket 10).

THE FOURTH STEP

Before considering step four of the evaluation process, the ALJ is required to determine a claimant's residual functional capacity ("RFC"). 20 CFR § 416.920(e).  RFC is a claimant's ability to do physical and mental work activities on a sustained basis despite any limitations from his impairments.  20 CFR § 416.945(a).  In making this finding, the ALJ must consider all of the claimant's impairments, including those which are not severe.  20 CFR § 416.945(e).  All of the relevant medical and non-medical evidence in the record must be considered.  20 CFR §§ 416.920(e) and 416.945.

Mr. Waddell is 5' 11" tall and his weight remained in the 311-313 pounds range throughout the relevant time period.  (AR, pp. 114, 357 and 516).  He has a tenth grade education and his past work experience was as a cook, fast food worker, and dish washer.  (Docket 8 at p. 3).  Mr. Waddell was 46 years

old as of the date of his application and 49 years old as of the date of the ALJ's decision.[4]  Id.

At step four, the ALJ found Mr. Waddell had the RFC for sedentary work. Id. at p. 2.  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 CFR § 416.967(a).  The ALJ specifically found Mr. Waddell's RFC allowed him to engage in the following work-related physical activities:

> [C]an lift and/or carry 20 pounds occasionally and 10 pounds frequently, stand and/or walk (with normal breaks) for a total of at least [two] hours in an [eight]-hour workday, sit (with normal breaks) for a total of about [six] hours in an [eight]-hour workday, [was] unlimited in push and/or pull activities (including operation of hand and/or foot controls) other than as stated above for lift and/or carry, occasionally climb ramps and stairs but should not be required to climb ladders, ropes or scaffolds, occasionally balance, stoop, kneel, crouch and crawl, and has moderate limitations (i.e., there is more than slight limitation in this area, but [Mr. Waddell was] still able to function satisfactorily) in an ability to interact appropriately with the public, interact appropriately with supervisors, interact appropriately with co-workers, and respond to usual work situations and to changes in a routine work setting.

(Docket 8, p. 2).

At step four, the ALJ found Mr. Waddell could not perform any of his past relevant work.  Id. at p. 3.  The evaluation then proceeds to step five.

---

[4]The ALJ mistakenly reported Mr. Waddell was 27 years of age on the date of his application and never corrected his age in any other part of the decision.  (AR, p. 14).

<u>THE FIFTH STEP</u>

At step five, "the burden shifts to the Commissioner to prove there are other jobs in the national economy the claimant can perform." <u>Baker</u>, 159 F.3d at 1144. "[T]he Commissioner's burden is to demonstrate that . . . jobs are available in the national economy, realistically suited to the claimant's residual functional capabilities." <u>Id.</u> "In determining the availability of such jobs, the claimant's exertional and nonexertional impairments, together with his age, education, and previous work experience, must be considered." <u>Id.</u> The Commissioner may satisfy this burden of proof by use of a hypothetical question, posed to a vocational expert, which "fairly reflects the abilities and impairments of the claimant as evidenced in the record." <u>Id.</u>

At step five, the ALJ found Mr. Waddell could perform a significant number of jobs in the national economy, including jobs as a telephone information clerk and a stone setter. (Docket 8 at p. 3). Based on this finding, the ALJ concluded Mr. Waddell was not disabled and denied benefits. <u>Id.</u> at p. 1.

**PLAINTIFF'S ISSUES ON APPEAL**

Plaintiff's brief in support of his motion to reverse the decision of the Commissioner identifies two issues. (Docket 10). Those are:

1.    The Commissioner's finding that plaintiff's subjective complaints of symptoms and functional limitations are not credible is not supported by substantial evidence in

9

that the Commissioner improperly evaluated and
discredited plaintiff's subjective complaints; and

2.   The Commissioner's unfavorable decision is not
supported by substantial evidence in that the
Commissioner improperly failed to grant controlling
weight to the treating psychologist's assessment of
plaintiff's functional restrictions.

Id. Each issue will be addressed separately.  Because the second issue

impacts on the resolution of the first, the analysis begins with the second

issue.

## DISCUSSION

2.   The Commissioner's unfavorable decision is not supported by
substantial evidence in that the Commissioner improperly failed to
grant controlling weight to the treating psychologist's assessment of
plaintiff's functional restrictions.

The ALJ spent only three pages of his seven-page opinion identifying and

addressing Mr. Waddell's physical and mental conditions.  (AR, pp. 11-14).  By

contrast, the parties laid out Mr. Waddell's medical history from July 12, 2005,

through February 5, 2008, over 22 pages in the JSMF.  (Docket 8, pp. 3-25).

"Medical opinions are statements from physicians and psychologists or

other acceptable medical sources that reflect judgments about the nature and

severity of [claimant's] impairment(s), including [claimant's] symptoms,

diagnosis, prognosis, what [claimant] can still do despite the  impairment(s),

and . . . physical or mental restrictions."  20 CFR § 416.927(a)(2).  In weighing

medical opinion evidence, the ALJ must consider the factors set forth in the

regulations.  20 CFR § 416.927(d).

Medical opinions are considered evidence which the ALJ must evaluate in determining whether a claimant is disabled, the extent of the disability, and the claimant's RFC.  20 CFR § 416.927(a)(2).  All medical opinions are evaluated according to the same criteria, summarized as follows:

1.  Whether the opinion is consistent with other evidence in the record;

2.  Whether the opinion is internally consistent;

3.  Whether the person giving the medical opinion examined the claimant;

4.  Whether the person giving the medical opinion treated the claimant;

5.  The length of the treating relationship;

6.  The frequency of examinations performed;

7.  Whether the opinion is supported by relevant evidence, especially medical signs and laboratory findings;

8.  The degree to which a non-examining or non-treating physician provides supporting explanations for their opinions and the degree to which these opinions consider all the pertinent evidence about the claim;

9.  Whether the opinion is rendered by a specialist about medical issues related to his or her area of specialty; and

10.  Whether any other factors exist to support or contradict the opinion.

See 20 CFR § 416.927(a)-(f); Wagner v. Astrue, 499 F.3d 842, 848 (8th Cir. 2007).

11

"[A] treating physician's opinion is given controlling weight if it is well supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence." Medhaug v. Astrue, 578 F.3d 805, 815 (8th Cir. 2009) (quoting Goff v. Barnhart, 421 F.3d 785, 790 (8th Cir. 2005) (internal quotation marks omitted).  The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a treating physician's opinion. 20 C.F.R. § 416.927(d)(2)(i).

"An ALJ may discount or even disregard the opinion of a treating physician where other medical assessments are supported by better or more thorough medical evidence, or where a treating physician renders inconsistent opinions that undermine the credibility of such opinions." Id.  However, "while entitled to special weight, it does not automatically control, particularly if the treating physician evidence is itself inconsistent." House v. Astrue, 500 F.3d 741, 744 (8th Cir. 2007) (citations and internal quotation marks omitted).  "A treating physician's opinion should not ordinarily be disregarded and is entitled to substantial weight." Jenkins v. Apfel, 196 F.3d 922, 924-25 (8th Cir. 1999).

If the treating physician's opinion is not given controlling weight under 20 CFR § 416.927(d)(2), it must be weighed considering the factors in 20 CFR § 416.927(d)(2)-(6).  See Shontos v. Barnhart, 328 F.3d 418, 426 (8th Cir. 2003) ("Where controlling weight is not given to a treating source's opinion, it is

12

weighed according to the factors enumerated. . . .").  When opinions of a consulting psychologist conflict with opinions of a treating psychologist, the ALJ must resolve the conflict.  <u>Wagner</u>, 499 F.3d at 849.  The ALJ must "give good reasons for discounting a treating physician's opinion."  <u>Dolph v. Barnhart</u>, 308 F.3d 876, 878-79 (8th Cir. 2002) (internal quotation marks omitted).

Mr. Waddell argues the ALJ erred by failing to give controlling weight to Dr. Herbel's opinions.  (Docket 10, p. 15).  Dr. Herbel is a clinical psychologist who first saw Mr. Waddell on November 8, 2005, at the Veterans Administration Medical Center ("VAMC") on referral for his anger problem.  (Docket 8 at p. 5).  Dr. Herbel recommended Mr. Waddell proceed with psychological testing to formulate a diagnosis and individual therapy.  <u>Id.</u>  Dr. Herbel wrote: "[b]ecause [Mr. Waddell] easily anger[ed] and may threaten others [Dr. Herbel] w[ould] monitor for homicidal ideation, contract with the patient as necessary, and alert the appropriate people (supervisor, law enforcement, potential victim) if there is imminent danger."  <u>Id.</u>  Dr. Herbel counseled Mr. Waddell on a monthly basis through February of 2008.  (Docket 8, *passim*).

13

The ALJ chose to accept the testimony of Dr. Robert Pelc, Ph.D.,[5] a psychological medical expert. (AR, p. 11). The ALJ wrote:

> [T]he record on a whole supports a conclusion that Dr. [Atkin's] opinions are reasonable. . . . [he] has a thorough amount of understanding of the disability program and the evidentiary requirements and is familiar with the other information in a claimant's case record, and he has considered all of the pertinent evidence in this claim, including opinions of treating and other examining sources, and he provided explanations at the hearing and was available for cross-examination.

Id. at p. 13. The ALJ "accord[ed] Dr. [Atkin's] opinions with substantial weight." Id. The ALJ gave "less weight" to the opinions of Dr. Herbel. Id. at p. 14. The ALJ made the following comment to support his conclusion.

> [T]he undersigned notes Dr. Herbel only sees the claimant once a month, and in review of those notes the undersigned notes the claimant presents with ups and down, and it appears Dr. Herbel has strictly chosen the "down" complaints as support for her assessments, and fails to include the claimant's "up" periods. Accordingly, the undersigned finds Dr. Herbel's opinions are inconsistent with her treatment notes and the record as a whole . . . .

Id. at p. 14.

Dr. Atkin completed a medical records review, prepared a Psychiatric Review Technique ("PRT") form and a Medical Source Statement of Ability to do Work-Related Activities (Mental) ("MSS"), and testified at the hearing. (Docket

---

[5]Dr. Pelc does not appear in the administrative record. The court presumes the ALJ meant to reference the work of Dr. Thomas C. Atkin who completed a review of Mr. Waddell's records and testified at the hearing. See AR, p. 9. For clarity, the court will reference the work of Dr. Atkin.

8 at p. 25).  In addition to treating Mr. Waddell on a monthly basis for over two years, Dr. Herbel also completed two separate MSS forms.  Id. at pp. 17-18 and 24-25.

The MSS[6] uses the following terms in describing a claimant's ability to perform various activities:

> None - Absent or minimal limitations.  If limitations are present, they are transient and/or expected reactions to psychological stresses.
>
> Mild - There is slight limitation in this area, but the individual can generally function well.
>
> Moderate - There is more than a slight limitation in this area but the individual is still able to function satisfactorily.
>
> Marked - There is serious limitation in this area.  There is substantial loss in the ability to effectively function.
>
> Extreme - There is major limitation in this area.  There is no useful ability to function in this area.

(AR, p. 934).  A comparison of Dr. Herbel's MSS of February 5, 2008, and the PRT and MSS of February 20, 2008, prepared by Dr. Atkin is enlightening.

| ACTIVITY | DR. HERBEL | DR. ATKIN |
|---|---|---|
| Remember locations and work-like procedures | Moderate | |
| Understand and remember short, simple instructions | Moderate | No limitation |
| Understand and remember detailed instructions | Marked | No limitation |
| Carry out short, simple instructions | Moderate | |

---

[6]The MSS forms completed by Dr. Herbel and Dr. Atkin are slightly different, but essentially focused on the same activities.

| ACTIVITY | DR. HERBEL | DR. ATKIN |
|---|---|---|
| Carry out detailed instructions | Marked | No limitation |
| Maintain attention and concentration for extended periods | Extreme* | |
| Difficulties in maintaining concentration, persistence, or pace | | Mild |
| Perform activities within a schedule, maintain regular attendance, and be punctual | Marked | |
| Sustain an ordinary routine without special supervision | Marked | |
| Work with or near others without being distracted by them | Marked | |
| Make simple work-related decisions | Moderate | No limitation |
| Ability to make judgments on complex work-related decisions | | No limitation |
| Complete a normal workday and workweek without interruptions from psychologically based symptoms | Extreme | |
| Perform at a consistent pace without an unreasonable number and length of rest periods | Extreme | |
| Interact appropriately with the public | Marked | Moderate |
| Ask simple questions or request assistance | Moderate | |
| *Dr. Herbel wrote "Pain interferes–short periods, only & exacerbates Mental Health Symptoms" | | |

| ACTIVITY | DR. HERBEL | DR. ATKIN |
|---|---|---|
| Accept instructions and respond appropriately to criticism from supervisors | Marked | |
| Interact appropriately with supervisors | | Moderate |
| Get along with co-workers or peers without distracting them or exhibiting behavioral extremes | Extreme | |
| Interact appropriately with co-workers | | Moderate |
| Maintain socially appropriate behavior | Marked | Moderate |
| Adhere to basic standards of neatness and cleanliness | Moderate | |
| Restrictions of activities of daily living | | Mild |
| Respond appropriately to changes in the work setting | Marked | Moderate |
| Be aware of normal hazards and take appropriate precautions | Moderate | |
| Travel in unfamiliar places or use public transportation | Marked | |
| Set realistic goals or make plans independently of others | Extreme | |

See AR, pp.934-36 compared to pp. 937-53.

Dr. Herbel diagnosed Mr. Waddell as suffering from an antisocial personality disorder.[7]  (Docket 8 at p. 22).  Dr. Durso, a VAMC psychiatrist who Mr. Waddell saw approximately five times during 2007, diagnosed Mr. Waddell's condition as depression, not otherwise specified,[8] and an impulse control disorder.[9]  (Docket 8 at pp. 19-23).  He prescribed Paxil (an anti-depressant), Risperidone (an anti-psychotic), and therapy.  Id. at pp. 19 and 22.  Dr. Atkin testified Mr. Waddell's diagnosis was an affective disorder[10] and a personality disorder.[11]  (Docket 8 at p. 25).

---

[7]Antisocial Personality Disorder is "an enduring and pervasive pattern characterized by continuous and chronic antisocial behavior with disregard for and violation of the rights and safety of others . . . [usually beginning in the early teens] and continuing in adulthood."  Stedman's Medical Dictionary 116700 (27th ed. 2000).

[8]Dr. Durso thought Mr. Waddell's depression might be chronic dysthymia.  (Docket 8 at p. 19).  Dysthymia is "[a] chronic mood disorder manifested as depression for most of the day, more days than not, accompanied by" other symptoms.  Stedman's Medical Dictionary 122470 (27th ed. 2000).

[9]An impulse control disorder is "a group of mental disorders characterized by a person's failure to resist an impulse to perform some act harmful to self or to others . . . ."  Stedman's Medical Dictionary 116700 (27th ed. 2000).

[10]An affective disorder is "a group of mental disorders characterized by a disturbance in mood."  Stedman's Medical Dictionary 116700 (27th ed. 2000).

[11]A personality disorder is a "general term for a group of behavioral disorders characterized by usually lifelong ingrained maladaptive patterns of subjective internal experience and deviant behavior, lifestyle, and social adjustment, which patterns may manifest in impaired judgement, affect, impulse control and interpersonal functioning."  Stedman's Medical Dictionary 116700 (27th ed. 2000).

18

A review of the transcript of the administrative hearing discloses a number of comments and observations by VA staff members which Dr. Atkin acknowledged supported Dr. Herbel's mental assessment of Mr. Waddell. Those comments and observations were as follows:

> Q    Jason [Chipman], the vocational rehabilitation counselor, whose name appears through this [record] . . . quite frequently, says at this time [Mr. Waddell] does remain substantially unemployable. He continues to show instability in the work place experiencing intra and interpersonal conflicts. Is that consistent with the treating psychologist's assessment?
> . . .
>
> A    Yeah, I'd say that's largely consistent, . . . I have a little bit of trouble with the extreme limitation on [get along with co-workers or peers without distracting them or exhibiting behavioral extremes].
> . . .
>
> Q    Jason [Chipman], vocational rehab counselor . . . says [Mr. Waddell] continues to struggle with interpersonal issues and does not appear to be able to see future consequences for his behavior. This ongoing behavior, interpersonal disruption at work, poor planning, difficulty with authority all of which appear to be lifelong, along with his work history, makes it doubtful that he will return to work to a . . . significant extent. . . . is that observation from a voc rehab counselor consistent with [Dr. Herbel's] assessment?
>
> A    That's . . . more consistent, yes.
>
> Q    Dr. [Herbel]. [Mr. Waddell] physically displays cutting on himself . . . indicating traits of borderline personality disorder as well. . . . all jobs have some contact with people even if it is just one boss. And that also has been proven to be . . . an extremely tenuous relationship within the highly supportive compensated work therapy program under the auspices of the VA. He is now with the [Incentive Therapy ("IT")] program which is less

19

stressful and demanding and quite protective in terms of meeting his needs.  Such work sites are not likely to exist in the community.  Is that kind of observation consistent with [Dr. Herbel's] assessment?

A    Yeah, that's consistent . . . with . . . her assessment.
. . .

Q    [Dr. Herbel] says [Mr. Waddell] has longstanding irreparable emotional damage . . . rendering it impossible for him to function appropriately on a job.  This man has persistent unstable inappropriate difficulty controlling his anger and frequently displays temper, more likely than not an outgrowth of his almost constant underlying anger since childhood.   Thus he is rendered unemployable and has been downsized from the [Compensated Work Therapy ("CWT")] program within the VA to the IT Program which is less stressful and demanding and most likely is not representative of a typical community job that would be available to [Mr. Waddell].  Is that observation consistent with her . . . assessment form?

A    Yes.
. . .

Q    August 28, 2007, a note from Dean [Schoenberner] . . . a work incentive worker . . in relation to the IT job, [Mr. Waddell] appears to be maintaining at work with a lot of support and intervention from the staff. . . [he] appears to be increasing the number of difficult interactions with others.   Would that be consistent with Dr. [Herbel's] assessment form?

A    Roughly, yes

Q    Same gentlemen . . . on October 18, 2007, . . . [Mr. Waddell] continues to have a difficult time maintaining acceptable interactions with others, along with his hygiene and dress.  [He] appears to be having more . . . difficulty maintaining his work schedule and stability with others . . . he will continue working in the greenhouse at this time.  Is that consistent with Dr. [Herbel's] assessment?

A.      Yeah.

(AR, pp. 24-27 ).  Dr. Atkin sought to clarify his dispute with the opinions of

Dr. Herbel.

> I don't dispute . . . you can go through and find comments in the
> record such as handed out by Claimant's representative.  But there
> are plenty of . . . comments consistent with . . . what I pointed out as
> well. . . . [Mr. Waddell] is currently working in the Ft. Meade incentive
> therapy program four days per week.  [His] participation is aimed to
> help [him] maintain structure, create self-worth, and social
> interaction.  [Mr. Waddell] is in the CWT/IT greenhouse where he has
> been observed doing an outstanding job.  [He] consistently shows
> good motivation and is maintaining stability.  He appears to be doing
> well in all areas with only limited periods of difficulty . . . interactions
> with others, customers purchasing, seems to feel good about his job
> . . . . That was by Mr. [Schoenberner].

Id. at pp. 28-29.  Dr. Atkin testified the person best situated from a

psychological point of view to determine whether Mr. Waddell is able to adjust

to the competitive work place would be the treating physician and the person

working with Mr. Waddell vocationally.  (Docket 8, p. 26).

While plaintiff's attorney only focused on a few of the comments of the VA

staff, the record is replete with counseling notes regarding Mr. Waddell's

interpersonal difficulties.  On August 5, 2005, Mr. Waddell was admitted to the

VA's CWT program to work in the Ft. Meade laundry.  Id. at p. 4.  The notes of

Mr. Chipman, a vocational rehabilitation counselor with the VA, reflect his

observations which are summarized as follows:

> September 16, 2005:  Mr. Waddell seems prone to impulsive
> behavior, especially when challenged or threatened by others who
> he perceives as having power over him.  He appears to display

21

some criteria for borderline personality disorder, antisocial personality disorder, and schizotypal personality disorder.  Id.

February 1, 2006:  Mr. Waddell showing more tolerance this week in the work place and using discretion more often rather than reacting to other peoples' comments.  He reports some mild interpersonal conflicts at his apartment.  He appears to be making progress, his employability continues to be unclear, both due to his knee issues and an apparent lifelong pattern of having interpersonal issues in all areas, including work.  Id. at p. 6.

February 10, 2006:  Mr. Waddell continues to struggle with interpersonal issues in the work place.  Id.

February 17, 2006:  Mr. Waddell uses sarcastic humor and reports no serious issues with his work environment that week.  He reports minor conflicts that put him at risk for loss of employment or interpersonal relationships.  He does not appear fully employable at this time both due to physical limitations and ongoing limitations in his interpersonal functioning.  Id. at p. 7.

February 22, 2006:  Mr. Waddell was dressed casually with adequate personal hygiene and grooming.  He used humor through his interview and was progressing slowly toward more stability.  It is unclear if he is employable.  He has a long history of interpersonal disruption in work environments, as well as problems with his right knee.  Id.

March 8, 2006:  Mr. Waddell reports a better relationship with his supervisor.  He has a better than average quality of work and ability to learn, average quantity of work, application of work, attendance and punctuality, ability to handle supervision, and personal grooming and hygiene.  He has below average ability to work with others.  Mr. Waddell's assessment reflects a historical pattern of having difficulty with interpersonal interactions and with his CWT job.  Id. at p. 8.

March 22, 2006:  Mr. Waddell is unable to work consistently due to his knee problem.  Id.

March 27, 2006:  Mr. Waddell appears to use assertiveness in his supportive environment, but does not appear to be employable.  Id.

April 28, 2006:  Mr. Waddell met with his CWT supervisor, who stated the quality of work was better than average and the quality and application of his work were industry level.  He had better than average ability to learn and work with others.  He had average punctuality.  He had industry level ability to handle supervision.  He had better than average personal grooming.  Mr. Waddell remained substantially unemployable and continues to show instability in the workplace, experiencing intra and interpersonal conflicts, which have been controlled with weekly case management and psychotherapy.  Id. at pp. 8-9.

May 3, 2006:  Mr. Waddell continued to struggle with some interpersonal disruptions.  He reports participation in the CWT transitional employment in the laundry facility where he struggles with interpersonal issues.  However, he states he made attempts at curbing his behavior.  Mr. Waddell remained substantially unemployable.  Id. at p. 9.

May 22, 2006:  Mr. Waddell reports he felt he was doing well.  He reports improvement at work and experienced less external problems.  Mr. Waddell continued to have intra-personal difficulties and reactions to work stress.  Id.

May 25,2006:  Mr. Waddell met with his CWT supervisor who rated the quantity of his work, quality of his work, application of his work, ability to work with others, attendance and punctuality, and ability to handle supervision as better than average.  His personal grooming and hygiene was industry level.  Id. at pp. 9-10.

May 31,2006:  Mr. Waddell reports some interpersonal difficulties at his work, characterized as mild to moderate.  He struggles with perceived slights from co-workers.  Id. at p. 10.

June 26, 2006:  Mr. Waddell is doing well, but has disruptive behavior disorder.  He appears stable and has made progress while in CWT.  He had some ups and downs interpersonally, but gaining some stability in this area.  Id. at p. 11.

June 30, 2006:  Mr. Waddell has better than average quantity of work, quality of work, ability to learn, and ability to handle supervision.  He has average application of work, ability to work

with others, attendance and punctuality, personal grooming and hygiene.  Id. at p. 12.

July 12, 2006:  Mr. Waddell continues to struggle with some interpersonal disruptions in his life and feelings of irritability at the laundry.  He remains substantially unemployable.  Id.

July 19, 2006:  Mr. Waddell continues to struggle with interpersonal issues and does not appear to be able to see future consequences for his behaviors.  This ongoing behavior–interpersonal disruption at work, poor planning, difficulty with authority, all of which appear to be lifelong–along with his very poor work history make it doubtful  he will return to work to a significant extent. Given the fact that employment looks doubtful, he will be transferred to IT on August 15.  Id.

July 24, 2006:  Mr. Waddell doing well and appears stable and making progress in CWT.  He had some "ups" and "downs" interpersonally and did not appear ready for employment.  Id.

August 2, 2006:  Mr. Waddell continues to struggle with some interpersonal disruptions in his life, including feelings of irritability.  He will most likely not return to employment.  Id.

On August 9, 2006, Mr. Lanning, another social worker affiliated with the VAMC, reported the goal of maintaining Mr. Waddell's CWT transitional employment was no longer appropriate because he was unemployable in the competitive job market.  Id. at p. 13.  As a result of that decision, Mr. Waddell was transferred into the IT program to work in the VA greenhouse.  Id.

On October 6, 2006, Mr. Lanning reported Mr. Waddell loved working at the greenhouse.  Id. at p. 15.  This surprised Mr. Lanning because he reported when Mr. Waddell was screened and accepted into CWT, the VAMC "felt [it was] really going out on the limb" that he "might not be able to cope with this

24

program." Id.  That report continued, Mr. Waddell had "done very well!" . . .

Mr. Waddell "really ha[d] exceeded [their] expectations."  Id.

Mr. Schoenberner, another therapist at the VAMC, began to see Mr.

Waddell after his transition to the IT program.  His reports contain comments

summarized as follows:

> October 20, 2006:  Mr. Waddell is in a good mood, dressed
> appropriately, and has good eye contact and fluent speech.  He has
> disruptive behavior, not otherwise specified, and it is
> recommended he continue working in the greenhouse in the IT
> program.  Id.
>
> October 30, 2006:  Mr. Waddell is doing well in the CWT [IT]
> program and it has gone a long way toward helping him feel more
> stable and productive.  Id. at p. 16.
>
> June 28, 2007:  Mr. Waddell works in the greenhouse where he is
> doing an outstanding job.  He consistently shows good motivation
> and appeared to be maintaining stability.  He appears to be doing
> well with only limited periods of difficult interaction with others.
> Mr. Waddell reports feeling good about his job and living situation.
> Id. at p. 20.
>
> August 28, 2007:  Mr. Waddell's work attendance remains
> inconsistent, due to his medical issues.  He is maintaining at work
> with a lot of support and intervention from staff, but he appears to
> be increasing the number of difficult interactions with others.  Id.
> at p. 21.
>
> September 26, 2007:  Mr. Waddell is scheduled to work five days
> per week but rarely achieved that, instead working on average
> three days per week.  He continues to have a difficult time
> maintaining acceptable interactions with others.  He also has
> difficulty maintaining his hygiene and dress.  Id. at pp. 21-22.

Dr. Herbel's opinions are consistent with Mr. Waddell's other treating

medical sources and non-medical sources.  Dr. Herbel's opinions are

contradicted only by Dr. Atkin, who is not a treating psychologist, never examined Mr. Waddell, and performed only a medical records review. The length of the treating relationship and the frequency of examinations of the claimant are also factors to consider when determining the weight to give a treating physician's opinion. 20 C.F.R. § 416.927(d)(2)(i). Dr. Herbel's opinions are not inconsistent with her own notes and her opinions are not inconsistent with the other medical and non-medical sources providing counseling and therapy to Mr. Waddell. 20 CFR § 416.927(a)-(f).

For the ALJ to suggest Dr. Herbel "strictly chose[] the 'down' complaints as support for her assessments, and fail[ed] to include the claimant's 'up' periods," fails to consider the full measure of her analysis of Mr. Waddell's mental health condition. (AR, p. 14). The IT program is not a competitive work environment, but rather, a therapeutic, highly supervised program designed to assist veterans back into the work force. All of the other treating mental health professionals acknowledged Mr. Waddell's longstanding explosive and confrontational personality, a problem which made it impossible for him to perform consistently even in the highly restricted and supervised environment of the IT work program. Because of Mr. Waddell's personality disorders, the IT program was not successful in moving him to the end goal.

Throughout the fall of 2007, Mr. Schoenberner reported Mr. Waddell was maintaining at work with a lot of support and intervention from staff, but he

appeared to be increasing the number of difficult interactions with others and was only working an average of three days a week.  (Docket 8 at p. 21).  Mr. Waddell's public conflicts even went so far as acknowledging he struck a former neighbor.  Id. at p. 23.  When Dr. Herbel completed the MSS on February 5, 2008, just two weeks before the administrative hearing, her conclusions regarding Mr. Waddell's mental status were consistent with his distant and immediate history of a severe personality disorder.

The review of an ALJ decision is "more than an examination of the record for the existence of substantial evidence in support of the Commissioner's decision . . . [the court must also] take into account whatever in the record fairly detracts from that decision."  Reed v. Barnhart, 399 F.3d 917, 920 (8th Cir. 2005) (quoting Haley v. Massanari, 258 F.3d 742, 747 (8th Cir. 2001)).  The ALJ erred, both factually and as a matter of law, when he chose to give substantial weight to the opinions of Dr. Atkin over the opinions of Dr. Herbel.  The Commissioner's findings on this issue are not supported by substantial evidence in the record as a whole.  42 U.S.C. § 405(g); Choate v. Barnhart, 457 F.3d 865, 869 (8th Cir. 2006).

Dr. Herbel's opinions are entitled to controlling weight.  "[A] treating physician's opinion is given controlling weight if it is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence."  Medhaug v. Astrue, 578

F.3d 805, 815 (8th Cir. 2009) (quoting <u>Goff</u>, 421 F.3d at 790) (internal

quotation marks omitted).

1.    The Commissioner's finding that plaintiff's subjective complaints of
      symptoms and functional limitations are not credible is not
      supported by substantial evidence in that the Commissioner
      improperly evaluated and discredited plaintiff's subjective complaints.

Plaintiff objects to the ALJ's decision asserting he failed to properly

consider Mr. Waddell's subjective allegations under the <u>Polaski</u> standards.

(Docket 10 at p. 5).  <u>See Polaski v. Heckler</u>, 739 F.2d 1320, 1322 (8th Cir.

1984) (To assess a claimant's credibility, the ALJ must consider all of the

evidence, including prior work records and observations by third parties and

doctors regarding daily activities, the duration, frequency, and intensity of

pain, precipitating and aggravating factors, the dosage, effectiveness, and side

effects of medication, and functional restrictions.).

Rather than identify how Mr. Waddell's testimony concerning the

intensity, persistence and limiting effects of his physical and mental

impairment were inconsistent with the record, the ALJ simple declared:

> [T]he claimant's medically determinable impairments could
> reasonably be expected to produce the alleged symptoms; however,
> the claimant's statements concerning the intensity, persistence and
> limiting effects of these symptoms are not credible to the extent they
> are inconsistent with the residual functional capacity assessment for
> the reasons explained below.

(AR, p. 13).  The ALJ then made a determination of Mr. Waddell's physical RFC,

adopting the assessment completed by Dr. Erickson, a state agency physician,

in June 2006.  Id.; see also Docket 8 at pp. 12-13.  Dr. Erickson concluded Mr. Waddell could perform light work.  (Docket 8 at p. 13).  "Light work" by definition is work which "involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds."  20 C.F.R. § 416.967(b).  The ALJ did not accept Dr. Erickson's opinion, however, as the ALJ concluded Mr. Waddell could perform only sedentary work.  (Docket 8 at p. 2).  "Sedentary work involves lifting no more than 10 pounds at a time and occasionally lifting or carrying articles like docket files, ledgers, and small tools."  20 CFR § 416.967(a).  After making the determination that Mr. Waddell could do only sedentary work, the ALJ mistakenly declared Mr. Waddell could "lift and/or carry 20 pounds occasionally," a physical capability reserved for light work.  See AR, p. 12 and § 416.967(b).

"The ALJ was required to make an express credibility determination explaining why he did not fully credit [claimant's] complaints."  Lowe v. Apfel, 226 F.3d 969, 971 (8th Cir. 2000).  That finding must be "adequately explained and . . . supported by the record as a whole."  Id. at p. 972.  The ALJ is "not required to discuss methodically each Polaski consideration, so long as he acknowledged and examined those considerations before discounting [a claimant's] subjective complaints."  Lowe, 266 F.3d at 972.  The ALJ made no specific or generalized findings regarding the Polaski factors.

It is not necessary to remand the case to the Commissioner for further findings on Mr. Waddell's subjective complaints because of the testimony of the vocational expert.  Testimony from a vocational expert constitutes substantial evidence when the testimony is "based on a properly phrased hypothetical question . . . ."  Goff v. Barnhart, 421 F.3d 785, 794 (8th Cir. 2005) (citing Haggard v. Apfel, 175 F.3d 591, 595 (8th Cir. 1999)).  The hypothetical question should include all of the claimant's impairments that are supported by substantial evidence in the record as a whole.  Id.  "A hypothetical question . . . is sufficient if it sets forth impairments supported by substantial evidence in the record and accepted as true."  Id. (internal citation and quotation marks omitted).

Mr. Tysdal, a vocational expert, testified the psychological restrictions identified by Dr. Herbel in her February 5, 2008, opinion would preclude the performance of all jobs.  (Docket 8, p. 28).  Since Dr. Herbel's opinion is entitled to controlling weight, the hypothetical question posed to Mr. Tysdal was proper and his answer constitutes substantial evidence.  Because Mr. Waddell is unable to make an adjustment to any work, he is disabled.  20 CFR § 416.920(g).  The ALJ erred as a matter of law in concluding otherwise.

The court finds substantial evidence in the record as a whole does not support the Commissioner's decision.  Choate, 457 F.3d at 869.  The court

further concludes an error of law was committed and the decision of the Commissioner should be reversed.  <u>Smith</u>, 982 F.2d at 311.

The court may affirm, modify, or reverse the Commissioner's decision, with or without remand to the Commissioner for a rehearing.  42 U.S.C. § 409(g).  If the court determines that the "record overwhelmingly supports a disability finding and remand would merely delay the receipt of benefits to which the plaintiff is entitled, reversal is appropriate."  <u>Thompson v. Sullivan</u>, 957 F.2d 611, 614 (8th Cir. 1992).

## CONCLUSION

The ALJ erred in not giving the opinion of Dr. Herbel controlling weight. Dr. Herbel's opinion is that Mr. Waddell has extreme limitations in his ability to (1) maintain attention and concentration for extended periods, (2) complete a normal workday and workweek without interruptions from psychologically based symptoms, (3) perform at a consistent pace without an unreasonable number and length of rest periods, (4) get along with co-workers or peers without distracting them or exhibiting behavioral extremes, and (5) set realistic goals or make plans independently of others.  These extreme psychological limitations, by the testimony of Mr. Tysdal, preclude Mr. Waddell from working in any job, regardless of his physical RFC.  Mr. Waddell is disabled and entitled to benefits.

## ORDER

Based upon this analysis, it is hereby

ORDERED that plaintiff's motion to reverse the decision of the Commissioner (Docket 9) is granted.

IT IS FURTHER ORDERED that pursuant to sentence four of 42 U.S.C. § 405(g) the decision of the Commissioner is reversed and the case is remanded to the Commissioner for the purpose of calculating and awarding benefits to plaintiff to which he is entitled under the Act.

Dated December 7, 2011.

BY THE COURT:

/s/ *Jeffrey L. Viken*

JEFFREY L. VIKEN
UNITED STATES DISTRICT JUDGE